LINEBACK *v.* SMITH.

## Opinion delivered November 17, 1919.

PARENT AND CHILD—SERVICES RENDERED BY CHILD—COMPENSATION.—A child can not recover for domestic services rendered its parent, unless there is a contract, express or implied, to pay for such services. Where a child brings a suit for services rendered its parent, the burden is upon the child to prove that the services were of such extraordinary character, that the parent would not expect the child, under the circumstances, to render such services without compensation; they must be of such nature that they could not be attributed to any filial duty or obligation.

Appeal from Benton Circuit Court; *W. B. Holyfield,* Special Judge; reversed.

*A. L. Smith,* for appellant.

1. The court erred in giving the instructions asked by appellee and in refusing those asked by appellant. The services were rendered by a member of the family of the intestate, and there was no contract, express or implied, to pay for his services rendered his mother, and there was no liability for the services rendered. 82 Ark. 136; 18 Atl. 129; 18 S. W. 517; 47 Penn. St. 534; 96 N. C. 149; 75 Ark. 191; 82 *Id.* 136; 2 S. E. 453.

2. All that part of the claim of appellee which had not accrued within three years of the mother's death was barred by limitation. Kirby's Digest, § 5064; 187 S. W. 664; 47 Ark. 317; 64 *Id.* 26; 27 *Id.* 343. The statute was plead expressly.

*D. C. Shannon* and *McGill & McGill,* for appellee.

1. The evidence shows an implied contract by appellee to live and care for his mother and he was entitled to recover for his services on same and the allowance was reasonable and just. 187 S. W. 664.

2. Instruction No. 5 given was approved in 56 Ark. 382; 75 *Id.* 191; 82 *Id.* 136.

3. The evidence supports the verdict fully. 82 Ark. 136. The verdict is right and reasonable and should be affirmed.

WOOD, J. Appellant's intestate was twice married. Her first husband was named Smith, by whom she had appellee. Her second husband was named Bell by whom she had several children, who are adults and all living.

After the death of Bell in the year 1910, Mrs. Bell lived on the home farm, her son Zeph Bell residing with her for two years. In the fall of 1912 she bought a small home in Siloam Springs and lived there until her death. Zeph Bell, after a few years, moved away. Mrs. Bell received the rents from the home farm until she died.

Appellee's father died when he was small and after his father's death he continued to live with his mother, making the Bell home his home until he married, after which he moved away with his family for three or four years. The wife and two children of the appellee left him and he had no knowledge of their whereabouts for twenty years. After this separation from his wife and children appellee returned and lived with his mother and Bell until Bell died and then he moved with his mother to the place she purchased in town in August, 1917. Appellee had no property of his own. After his mother moved to town he would occasionally work in the harvest fields of Kansas and work at odd jobs at other places, but had no regular occupation. When appellee was at home with his mother he assisted around the house, in the garden, cutting wood, and assisting in washing and doing other household duties. After the death of Bell, Mrs. Bell drew a pension of $12 per month. This with the rents from the farm was the sole income. At the time of her death she had notes and cash amounting to $529.44 and the home she lived in. In the latter part of her life she was afflicted with rheumatism and some months before her death she had three attacks, the last resulting fatally. On the occasion of the second of these attacks, her daughter, Mrs. Mills, who was residing in Missouri, came down and nursed her mother and when she returned to her home left a hired woman to look after her mother. During the last attack she returned to her mother's bedside and nursed her until she died. At that time the two other children were present.

The home in town was bought with money which Mrs. Bell derived from the estate of her last husband.

After the death of Mrs. Bell the appellant was appointed administrator and the appellee through his attorney presented to the administrator his claim as follows:

"For living with and caring for deceased from
    January 1, 1913, to December 31, 1915, at
    50c per day ................................................................$  547.50
"From January 1, 1916, to August 23, 1917,
    (date of death) at $1.00 per day (she being
    practically helpless during this time)..............  600.00

                                           "$1,147.50"

This claim was duly verified. The administrator refused to allow the same, and the appellee filed the claim with the probate court of Benton County. The administrator appeared in the probate court and resisted the allowance of the claim, setting out that the claim was not just and that his intestate, Irene Bell, was not indebted to the claimant in the sum stated or in any other sum. The administrator alleged that the claim for services charged for prior to the 23d day of August, 1914, was barred by the statute of limitations, which he specifically pleaded. He further claimed that the appellee practically all his life had lived with Mrs. Bell; that he was never employed to care for her at any time; that Mrs. Bell shared her home with the appellee and provided him with food, for which he paid nothing; that if he ever earned or came into possession of any money or property he used it as his own and spent nothing in caring for or supporting his mother, Mrs. Bell.

The probate court disallowed the claim and appellee appealed to the circuit court, where upon the same issues, a jury returned a verdict in favor of the appellee in the sum of $300.

From a judgment entered in appellee's favor is this appeal.

The appellee testified that he had been living with his mother at the time of her death about six years. Her husband, Bell, had been dead three or four years. Witness was in Kansas when his mother bought the home place. He came from Kansas to live with his mother in Arkansas. He was working for wages in the harvest fields of Kansas, earning from $3.50 to $4 per day. He came home and from that time on lived with his mother. He helped to move his mother from the farm to Siloam Springs, and also moved his own "trunk and other traps" to his mother's home. He always left them at her home when he worked out. When he didn't have work he made his mother's home his home until his mother died. Witness lived with his step-father and mother until he was 18 or 19 years old. Witness was the only child by his mother's first marriage. With the money witness earned he put some in provisions and in clothes for himself and helped support himself and mother. His testimony shows that he did the customary work around the premises.

Witnesses testified to the effect that while the appellee was in Kansas, Mrs. Bell told them she wrote for the appellee to come, stating that she would buy the place in town if she thought appellee would come back and live with her. After she moved to town Mrs. Bell was in poor health and during the last year of her life was not very strong. During that time there was no one else except the appellee on the place caring for her and doing her work, except during her last illness.

One of the witnesses stated that during the whole period of appellee's living with his mother and the different work he did for her in the condition she was in, witness would not want to wait on her for less than $1 to $2 a day. The day before the night on which appellee's mother died, appellee went with witness fishing on the river. Every time Mrs. Bell got real sick some or all her daughters would come down.

Another witness stated that in a conversation with Mrs. Bell she spoke about not wanting to live with her son Zeph, but wanted appellee to come and take care of

her and was willing to buy a home and leave it to him if he would come. Appellee did come and Mrs. Bell told witness that she wanted Louie to have the property after her death.

The above and other witnesses testified that they never heard Mrs. Bell say anything about an agreement to have appellee stay with her and pay him 50 cents per day.

There is much other testimony of the same character in the transcript, but after a careful consideration of it we have reached the conclusion that there is no testimony which under the law applicable in such cases would warrant the verdict and judgment in favor of the appellee.

The law is stated by this court in *Williams* v. *Waldon,* 82 Ark. 136-142, as follows:

"The presumption is that services rendered by members of the same family, and especially between father and son, are gratuitous. Such services are enjoined by the reciprocal duties of the family relation; and are always presumed to have been prompted by natural love, rather than by the promise or the hope of pecuniary reward. Courts are reluctant to infer a pecuniary recompense from the performance of filial or parental duties such as humanity enjoins. Hence the burden is upon him who claims a money recompense for personal services performed, whether voluntarily, or upon the request of the other, to establish a contract expressed or implied, for such consideration."

In the case of a child rendering domestic services to a parent there can be no recovery unless there is a contract either expressed or implied to pay for such services. Where a suit is brought by a child for services rendered the parent the burden is upon the child to prove that they were of such extraordinary character that the parent would not expect a child under the circumstances to render such services without compensation. They must be of a nature that they could not be attributed to any filial duty or obligation.

There is no evidence of a substantial character which tends to show that the services rendered by the appellee to his mother were different from those which a son might be reasonably expected to render his mother in the situation in which they were placed after the death of Bell and during the time appellee continuously made his home with her, although at times temporarily absent. The services were not of the extraordinary kind from which a promise will be implied to make compensation therefor. Expressions of preference for the appellee on the part of his mother after the death of her husband, Bell, to the effect that if he would come and live with her he should not lose anything and that she expected him to get what she had at her death, would not raise an implied contract to remunerate him for the services which might well be attributed to the affection and loyalty of a dutiful son to his mother. *Zimmerman* v. *Zimmerman,* 18 Atl. 129; *Reynolds* v. *Reynolds,* 18 S. W. 517; *Leidig* v. *Cooper,* 47 Penn. St. 534; *Dodson* v. *McAdams,* 96 N. C. 149.

As we view the evidence, there being neither an expressed nor an implied contract to pay appellee for the services for which he claims, the judgment awarding him compensation for such services is erroneous.

The judgment is, therefore, reversed and the cause dismissed.