P. M. BROWN v. H. FRANK HOLMAN, Administrator of Estate of ISAAC BROWN, Appellant.

P. M. BROWN, Appellant, v. H. FRANK HOLMAN, Administrator of Estate of ISAAC BROWN.

Division One, March 14, 1922.

1. **APPELLATE JURISDICTION:** Cross-Appeals. Where plaintiff sued for $18,900 and recovered judgment for $4500, and both parties appealed, appellate jurisdiction is in the Supreme Court.

2. **PARENT AND CHILD:** Contract for Services: Evidence. Services rendered by a child to a parent are not presumed, as in cases between strangers, to be for pay, and to entitle a child to recover for services rendered the parent the burden is upon the child to show a contractual relation evidencing an intention upon the part of the parent to pay and a right upon the part of the child to demand and receive such pay.

3. ———: ———: ———: **Demurrer.** Where a son filed a claim against the estate of his deceased father for services as manager and foreman of the farm of said deceased and labor performed thereon during about twenty-one and a half years, and there was

292 Mo.—41

Brown v. Holman.

evidence that the father, who was a farmer and stock trader and frequently away from home, persuaded the son not to go to school and to remain on the farm and that he would "pay" him for his services and that the son agreed to do so and remained on the farm, acted as manager, put in and harvested crops, erected buildings, kept up fences, raised the stock, managed the hands, and worked practically every day during the whole time claimed for, except about a year when he was away, and received no compensation except his room and board, and the evidence further showed that the father said he wanted the son "to have pay out of his estate for taking care of the farm and stock and taking care of him," such evidence justified the inference that there was a mutual understanding or agreement between the son and the father that the son was to be paid and was sufficient to submit to the jury the issue as to whether or not there was such an understanding or agreement, and the demurrer to the evidence was therefore properly overruled.

4. ———: ———: ———: Hearsay: Exception: Declarations of Decedent. Where a son filed a claim against the estate of his deceased father for services as manager and foreman of the farm of said deceased and for labor performed thereon, it was error for the trial court to exclude as evidence a paper, shown to have been signed by the father and found among his papers after his death, addressed "to whom it may concern" and to the effect that he (the father) agreed that his son should take full charge of his farm and stock and should act as foreman and manager and if he remained in the father's employ until the father's death he should do as he saw fit with the remaining portion of the father's property, both real and personal, after he had received compensation for his services from this date September 13, 1885, of not less than fifty dollars per month out of the father's possessions. Such instrument amounted to a written declaration which might be characterized as an exception to the hearsay rule; and the circumstances attending it, such as the death of the declarant, the proof of his signature, the discovery of the instrument among his papers, the relevancy of the declaration to the matter under inquiry, the fact that the matters therein touched upon presumably related to things of which the declarant was personally cognizant, and that the declaration was against the pecuniary interest of the declarant, who had no probable motive to falsify or mistake the matter declared, all rendered it admissible.

Appeal from Randolph Circuit Court.—*Hon. A. W. Walker*, Judge.

REVERSED AND REMANDED.

*James P. Boyd* and *Hunter & Chamier* for plaintiff.

(1) It is conceded that the burden was on plaintiff to prove an agreement to pay for the services rendered by him and set out in his claim; however, this could be proved either by direct testimony, or by facts or circumstances indicating a mutual understanding and intention to that effect. Hyde v. Honiter, 175 Mo. App. 583; Kingston v. Roberts, 175 Mo. App. 69; Hartley v. Hartley, 173 Mo. App. 18; Cole v. Fitzgerald, 132 Mo. App. 17; Fitzpatrick v. Dooley, 112 Mo. App. 165; Brand v. Ray, 156 Mo. App. 622; Lillard v. Wilson, 178 Mo. 154. (2) The real question is, was it the mutual understanding and intention of plaintiff and deceased, that plaintiff's services were to be paid for? Hays v. Miller, 189 Mo. App. 81; Christianson v. McDermott, 123 Mo. App. 448; Hartley v. Hartley, 175 Mo. App. 18. (3) The intention of plaintiff to receive compensation, and the intention of the deceased to pay plaintiff, for the services in question, having been sufficiently established by the evidence, the court properly overruled defendant's demurrer. Hyde v. Honiter, 175 Mo. App. 583; Kingston v. Roberts, 175 Mo. App. 69; Hartley v. Hartley, 173 Mo. App. 18; Cole v. Fitzgerald, 132 Mo. App. 17; Christianson v. McDermott, 123 Mo. App. 448; LeCount v. Fountain's Estate, 182 S. W. 102; Cupp v. McCallister, 114 Mo. App. 111; Stone v. Troll, Admr., 134 Mo. App. 308; Hays v. Miller's Estate, 189 Mo. App. 72. (4) The court erred in refusing to admit the paper writing, signed by the deceased and which was found among his papers after his death.

*M. J. Lilly, W. B. Stone, J. W. Wight* and *J. W. Whitecotton* for defendant.

(1) The plaintiff wholly failed to sustain his burden of proof by any substantial testimony offered by plain-

tiff in his case in chief, and the demurrer to the evidence asked at the close of the plaintiff's case in chief should have been given. Clow v. Wormington, 206 S. W. 416; Morrison v. Morrison, 187 Mo. App. 527; Crowley v. Dagley, 174 Mo. App. 561; Brand v. Ray, 156 Mo. App. 623; Taylor v. George, 176 Mo. App. 215. (2) All the testimony having failed to show a contract or that either party supposed there was a contract, and the burden of proof required by law not having been met by the proof, the instruction in the nature of a demurrer asked by the defendant at the close of all the evidence in the case should have been given. Wood v. Lewis, 183 Mo. App. 553; Hyde v. Honiter, 175 Mo. App. 583.

ELDER, J.—This action originated in the Probate Court of Randolph County, being a claim for $18,900 filed by P. M. Brown (hereinafter referred to as plaintiff) against the estate of Isaac Brown, deceased, for services as manager and foreman of the farm of said deceased and labor performed thereon from September 13, 1885, to March 17, 1917, at $600 per year. Upon a hearing in the probate court judgment was rendered in favor of plaintiff for the full amount of the claim. An appeal from said judgment was taken by H. Frank Holman, administrator *pendente lite* of the estate of said Isaac Brown (hereinafter referred to as defendant), to the Circuit Court of Randolph County, where, upon a trial to a jury, a verdict and judgment for $4500 was rendered in favor of plaintiff. Appeals from this judgment were taken by both plaintiff and defendant and allowed to the Kansas City Court of Appeals. That court, being of the opinion that the amount in dispute is the sum demanded, to-wit, $18,900, has transferred the cause to this court. In view of plaintiff having appealed from the judgment for $4500, contending that the amount of the verdict was inadequate, and in view of the fact that plaintiff's original claim is for $18,900, we hold that the action of the Court of Appeals was proper, notwithstanding defendant has also appealed from the $4500 judg-

ment, urging that plaintiff is not entitled to recover at all. [Craton v. Huntzinger, 187 S. W. (Mo.) 48.] The cause is therefore before us on cross-appeals.

The facts involved, as disclosed by the record, are substantially as follows:

Isaac Brown died in March, 1917, on his farm near Moberly, in Randolph County, at the age of eighty-two years, leaving an estate consisting of personal property appraised at $2268 and approximately five hundred acres of land. He left surviving him a wife and five children, being Peter M. Brown, the plaintiff, then aged about fifty-six years, two other sons, Elliott and Oscar Brown, and two daughters, Amanda and Mary Catherine Brown. Peter M., the plaintiff, was also known as "Cella," and was the eldest of the children. Oscar was the youngest, being at the time of the death of his father about forty-two years of age. When Isaac Brown died there were living with him on the home place, his wife, then aged about eighty-two years, the plaintiff, and the two daughters above mentioned. Oscar Brown left home when he was about seventeen years of age, but returned at times to work as a hired hand. Elliott left when he was about twenty-one, returning "by fits and spurts," as testified to by Mary Catherine. The deceased was a stock buyer, traded in stock, and ran a threshing machine, all of which took him away from the farm a good portion of the time.

Over the objection of counsel for defendant, Mary Catherine Brown testified on behalf of plaintiff that when plaintiff "was about twenty-two years old he wanted to go to school—wanted a business education—the work on the farm was hard for him, and his head ran to mathematics; but his father was in need of his services, and his father was away from home a good many days at a time, . . . so his father told him he would pay him better than he could make at anything else, and persuaded him to give up the idea of going to school. . . . He said he would pay him better than if he got a business education, by staying on this farm and managing this farm for him while he was gone, and help him on all the

work;'' that plaintiff said he ''would stay and do this work and see after this farm and give up his school;'' that plaintiff received his board and room and ''planted the crops and saw to putting up the hay and raised the stock; but these other boys were younger and Cella had full charge; and he put up the hay the same as if my father was there—that is, he managed these other boys and hands;'' that on one occasion in the fall of 1896, when witness's father was sick in bed and she was passing to and fro from the room, and when one John Clubb and Jake Evans were conversing with her father, her father said that Cella ''was to have everything he left at his death to pay him for his work;'' that at times witness would ask her father, ''What did Cella have to show for his work when he wasn't paying him for his work?'' to which he replied, ''When I am dead he will have it all;'' that a couple of years before her father's death all the money which he had in the bank ''was put in his (plaintiff's) name and in a bank book to him,'' after which plaintiff signed all checks; that plaintiff ''managed all the crops; he raised the stock and he planned and erected all the buildings but one on the place, and saw that the fences were kept up. As a matter of course he and his father talked together about a great many things, but still Cella was the manager. When my father was gone he was there all the time.'' Witness expressed the opinion that a thousand dollars a year would have been reasonable compensation for the services rendered by plaintiff. On cross-examination the witness stated that plaintiff had worked on the home place all of the time from 1882 or 1883 to 1896, except about one year when he cropped on another place. On re-direct examination she stated that during that year plaintiff had come home and ''helped with all the work through the wheat harvest and in selling of the wheat.''

Amanda Brown testified on behalf of plaintiff in part as follows:

''Q. State whether or not you ever heard any conversation between your father and Cella with reference

to him staying there and working on the farm? A. Yes,
I remember more conversations than one, but the first
one was when he was trying to go to school about 1882
and 1883. He was very anxious to go and plead with his
father and made different explanations to his father-that
he might see the need of it and father began to discourage
him and plead with him to stay; but father told him
finally if he would stay he would pay him better than
anybody—give more for his services than he could get
anywhere. So he said, 'I will.'

"Q. That was when he was between twenty-one and
twenty-two? A. Yes, along in there.

"Q. Did he or not stay? A. He stayed.

"Q. How long did he stay? A. He is there now.

"Q. Tell the jury what he did there? A. Well, he
did everything that was to be done that anybody would
do on the farm—did all the general work. He was fore-
man, and he put in the crops, and he harvested the crops,
and managed the hands and managed all the buildings,
and managed to get the money to pay for them, and
managed to do the work, and took the responsibilities
on his shoulders, and he is still at it.

"Q. Was your father away from home? A. He
was away from home a good deal—he was a stock buyer
and trader, and he would buy stock and be gone two
weeks at a time and sometimes longer."

Witness also testified that about 1916 her father
changed his bank account to plaintiff's name.

Jake Evans testified that he had known Isaac Brown
for thirty years or more; that when Brown had pneu-
monia he (witness) and John Clubb were at the Brown
home.

"Q. State whether or not you heard Uncle Ike at
that time say anything about Cella and the work he was
doing there? A. Yes, sir.

"Q. Tell the jury what Uncle Ike said. A. Mr.
Clubb and I were there two nights. The first night he
was pretty poorly, but the second night he wasn't so
bad—he was able to talk to us a good deal. He said to

me and Mr. Clubb that he wanted Cella to have pay out of his estate for taking care of the farm and stock and taking care of him."

J. T. Boney, farmer, testified that plaintiff apparently handled the farm "as if it was his own," although witness "recognized it was Uncle Ike's;" that he "stayed there continuously as a farmer like the rest of us;" and that services of the character performed by plaintiff were worth $25 a month on the average, from 1885 to 1917.

H. G. Tomlinson, farmer, testified that plaintiff did "all kind of farm work;" that it seemed to him like plaintiff ran and managed the farm; and that in his judgment $25 a month would be very reasonable compensation on the average since 1885 for a man who "acts as a farm hand and oversees the farm."

William Cox, farmer, testifying as to the character of work done by plaintiff, stated, "Well, a little of all kind. The biggest part was to keep the tools in shape for his father, and he would work on the outside, too; but he generally seen that the machinery and everything was in running order, and he planted all the corn and generally run the binder and mowing machine or anything else on the place, and attended to the stock and watered and fed 365 days out of the year." Testifying as to what would be a reasonable compensation for the services rendered by plaintiff the witness said, "I should think $500 a year."

On behalf of defendant, Oscar Brown testified that from 1883 to 1890 he was on the farm with his father; that while he was there his father managed the farm and took part in the labors thereon; that his father attended to the buying and selling of the stock; that after witness left the farm he visited back and forth very frequently, and in 1914 returned to work as a hired hand at one dollar per day, which was paid him by his father; that he knew nothing about plaintiff being manager of the farm and never heard of any agreement or contract; that at the time of the father's death plaintiff claimed and retained certain stock, feed and farm machinery of

the reasonable value of $2,000; and that plaintiff did not remain on the farm all of the time but was "off up here in Macon County feeding cattle part of the time, and he was here in the butcher shop, and in 1889 he was down on the Phelps place—he was keeping house down there." On cross-examination the witness stated that he never did any work under the management of plaintiff; that plaintiff was in bed "a right smart time," but "done general plowing, raking and whatever you do on a farm," but was "pretty slow about his work;" that when plaintiff was feeding cattle in Macon County he had been sent there by his father to feed the father's cattle on a farm owned by the latter.

George Chilton, Jack Roberts, B. R. Sorrel and Joe Parish testified on behalf of defendant that they had traded in live stock with Isaac Brown, with all of which trades plaintiff had nothing to do. On cross-examination these witnesses all stated that they saw plaintiff working around the farm. Chilton, Sorrel and Parish also testified that Isaac Brown was away a great deal of the time with a threshing machine which he ran.

Counsel for defendant introduced in evidence the inventory of the estate of Isaac Brown; also the petition in a partition suit brought by plaintiff, his brother Oscar and his sisters Amanda and Mary Catherine, against Elliott A. Brown and Mary Catherine Brown Sr., seeking to partition the real estate of which Isaac Brown died possessed.

At the close of plaintiff's case and again at the close of the entire case, defendant offered an instruction in the nature of a demurrer to the evidence which was refused by the court.

The foregoing fairly outlines the case as presented. Further evidence which is relevant to the issues involved will be alluded to in the course of the opinion.

I. Learned counsel for defendant contend that plaintiff wholly failed to sustain his burden of proof by any substantial testimony, and, that all the testimony having

Demurrer
to Evidence.
failed to show a contract or that either party supposed there was a contract, the demurrer to the evidence interposed at the close of plaintiff's case, and again at the close of all the evidence in the case, should have been sustained.

Learned counsel for plaintiff concede that the burden was on plaintiff to prove an agreement to pay for the services rendered by him, but argue that this could be proved either by direct testimony or by facts or circumstances indicating a mutual understanding and intention to that effect. Counsel further argue that the intention of plaintiff to receive compensation and of the deceased to pay him was sufficiently established by the evidence to take the case to the jury, and that hence the court properly overruled defendant's demurrer to the evidence.

In our opinion the contentions advanced for plaintiff are well supported by authority. In so concluding we have not been unmindful of the decisions of our several courts of appeals cited by counsel for defendant in their brief. An examination thereof shows, however, that the general doctrine therein enunciated, which is apposite to the question under consideration, is that services rendered by a child to a parent are not presumed, as in cases between strangers, to be for pay, and to entitle the child to a recovery for services rendered the parent a contractual relation must be shown, evidencing an intention on the part of the parent to pay and a right on the part of the child to demand and receive such pay. With this doctrine we find no fault. However, as said in Cowell v. Roberts, 79 Mo. l. c. 221, ''The promise to pay may be implied from any facts or circumstances which in their nature justify the inference of an actual contract of hire or an actual understanding between the parties to that effect.'' It is enough for the claimant to adduce evidence from which the jury might find that he and the deceased understood that the services rendered were not voluntary, but were to be remunerated. [Cole v. Fitzgerald, 132 Mo. App. l. c. 24; Fry v. Fry, 119 Mo. App. 476.] And in the instant case that Isaac Brown

intended to pay plaintiff is shown by the testimony of Mary Catherine Brown and Amanda Brown, who stated that their father persuaded plaintiff not to go to school, telling him that *"he would pay him* better·than if he got a business education" and that "if he would stay *he would pay him* better than anybody—give him more for his services than he could get anywhere." This intention is further made apparent by the testimony of the witness Jake Evans who stated that the deceased had told him that "he wanted Cella *to have pay* out of his estate for taking care of the farm and stock and taking care of him." That plaintiff agreed to this proposal, and thereby in effect entered into a contract with his father, is shown by the testimony of Mary Catherine ·Brown who stated that plaintiff said he "would stay and do this work and see after this farm and give up his school;" and of Amanda Brown who testified that plaintiff said, "I will." Moreover, the character of the work done by plaintiff and the interest displayed by him in that work; the fact that he acted as manager of the farm, put in and harvested the crops, erected all the buildings but one, kept the fences up, raised the stock, managed the hands, and worked practically every day during the whole time claimed for, except for about a year when he was away, coupled with the fact, so far as the record reveals, that he received no compensation except his room and board, justifies the inference that there was a mutual understanding or agreement between plaintiff and the deceased that plaintiff was to be paid. And the entire evidence was sufficient to submit to the jury the issue as to whether or not there was such an understanding or agreement. [Fry v. Fry, 119 Mo. App. 476; Cole v. Fitzgerald, 132 Mo. App. 17; Hyde v. Honiter, 175 Mo. App. 583; Kingston v. Roberts, 175 Mo. App. 69; Stone v. Troll, 134 Mo. App. 308; Smith v. St. Francois Circuit Court, 19 Mo. 433; Hart v. Hart, 41 Mo. 441.]

Defendant's contention is therefore ruled against him.

II.   Plaintiff urges that the court erred in refusing to admit in evidence a paper identified as exhibit "A," being an instrument in writing purporting to have been signed by Isaac Brown, and claimed to have been found among his papers after his death, the same being as follows:

*Hearsay: Exception to Rule.*

"To whom it may concern

"I agree that my son P. M. Brown being of sober and steady habits and who is now past 21 yrs of age shall take full charge of my farm and my stock and shall act as foreman and manager of the same and at the same time said P. M. Brown have and rear his own stock and if said P. M. Brown remains in my employ until my death said P. M. Brown shall do as  he sees fit with the remaining portion of my property both real and personal after said P. M. Brown has received a compensation for his services from this date Sept. 13th 1885 of not less than fifty dollars per month out of my possessions.

"Isaac Brown

"Witnesses

"R. J. Tait

"Bob McGregor."

With respect to said exhibit Mary Catherine Brown testified as follows:

"Q.   I will get you to look at that instrument, and will get you to state whose signature that is?   A.   It looks like my father's handwriting.

"Q.   Have you ever seen your father write?   A. Hundreds of times.

"Q.   You are familiar with his signature?   A.   Yes, sir.

"Q.   State whether or not, in your opinion, that is his signature?   A.   I would take it for his writing.

"The Court:   You mean the whole instrument?   A. His name—I haven't looked at the others.

"Q.   I will get you to state when you first saw that instrument, when you first heard it read?   A.  In Hunter & Chamier's office—I think it must have been Labor Day, 1917.

"Q. Where did your father keep his papers? A. He gave his papers to my mother and she kept them in a sack up stairs, but it was taken from there and put in a box and finally carried to the smoke house—these were old papers.

"Q. Did you all make a search in the box in the smoke house? A. Yes, Cella and I—we found this paper about the last of August, 1917.

"Q. In a box, you say, in the smoke house? A. Yes, sir.

"Q. What kind of papers were they? A. Some letters and some notes, and I don't remember what else. They were papers he had given her and she had kept them for years and we didn't suppose they were of any value.

"Q. Do you know whose handwriting the body of the instrument is in? A. I do not.

"Q. I will get you to state who R. J. Tait is? A. My mother's brother—he is dead.

"Q. Do you know who Bob McGregor is? A. Yes, he is a man who was brought in from some place in the north at the time they had a strike here, and he didn't hold his job—he was considered a scab at that time.

"Q. Were you acquainted with him? A. Yes, he came there and my father hired him as a hand on the place."

The jury having been excused, counsel for defendant examined the witness further as follows:

"Q. Do you know where that Plaintiff's Exhibit A, to which your attention was called, was found? A. It was found in my mother's and father's papers—the papers that my mother kept, and they had been taken in a box to the smoke house.

"Q. Were you present when it was found? A. No, I was not. We had looked in there, Cella and I, but company came and we let it go and I didn't look any more. She spoke to him about it and he looked, and I saw him bring the paper in.

"Q. But you were not present to see where he got it? A. No, but he said he got it out of this box.

"MR. LILLY: That statement should be stricken out.

"Q. You know where he came from? A. Yes, sir.

"Q. And he had the paper in his hand? A. Yes, sir."

Relative to the said exhibit Amanda Brown testified as follows:

"Q. Did you ever see the paper which I hand you, marked Claimant's Exhibit A? A. Yes, sir.

"Q. Do you know where that came from? A. Yes, sir.

"Q. Where? A. Out of a box of papers in the smoke house.

"Q. Whose box of papers? A. Father's and mother's—they were put in a box and carried out during my father's illness.

"Q. And that came out of the box in which the papers were? A. Yes, sir—there were lots of them in there. For years letters and receipts were there long before this was dated.

"Q. Did you ever hear your father make any statement along the line that he had executed any such document as that?

"MR. WHITECOTTON: We object to that.

"THE COURT: Sustained. (Exception saved.)

"Q. Did your father or not ever say anything in your presence about having signed such an instrument of writing?

"MR. WHITECOTTON: We object to that—that is incompetent.

"THE COURT: Sustained. (Exceptions saved.)

"MR. CHAMIER: We offer this agreement in evidence, your honor, Claimant's Exhibit A.

"MR. LILLY: We object for the reason heretofore stated.

"THE COURT: Yes, I don't think you have added anything to the proof that has gone before.

"The Court: Q.  Did you get this out of the box?
A.  No, my brother got it out—I saw him pick the paper
up and hold it in his hands.

"Q.  That was after your father died?  A.  Yes.

"Q.  You never saw it before his death?  A.  No,
I never saw it until that day.

"The Court:  Objection sustained to the paper,
Claimant's Exhibit A.  (Exceptions saved.)"

An analysis of the foregoing testimony convinces us
that the exhibit offered should have been admitted in
evidence.  The instrument amounted to a written decla-
ration which might be characterized as an exception to
the hearsay rule.  The circumstances attending the pap-
er, such as the death of Isaac Brown, the declarant; the
proof of his signature;  the discovery of the instrument
among his papers;  the relevancy of the declaration to
the matter under inquiry;  the fact that the matters there-
in touched upon presumably related to things of which
the declarant was personally cognizant;  the fact that the
declaration was against the pecuniary interest of the
declarant;  and the fact that the declarant had no prob-
able motive to falsify or misstate the matter declared,
all bring the paper with the requirements laid down by
the authorities for its admissibility.  [Wynn v. Cory,
48 Mo. 346;  Boynton v. Miller, 144 Mo. 681;  4 Ency.
Evidence, 87;  22 C. J. 231, 232;  Bradenkamp v. Rouge,
143 Ill. App. 492;  2 Jones, Evidence, sec. 323;  Burns
v. Smith, 169 Am. St. 653;  Succession of Trouilly, 52
La. Ann. 276;  Bartlett v. Patton, 33 W. Va. 71;  Gracie's
Estate, 158 Pa. St. 521;  Waddell v. Waddell, 87 Mo.
App. 216.]

III.  The matters considered in the two preceding
paragraphs cover the errors particularly stressed by
both plaintiff and defendant.  Other errors in the matter
of giving and refusing instructions are also urged.
However, in view of our ruling, supra, upon the question
of the admissibility of exhibit "A" offered by plaintiff,
a retrial of the cause will be necessary, at which time

the additional errors assigned, if error exists, can be obviated or corrected.

Our judgment therefore is that the judgment of the trial court be reversed and that the cause be remanded for a new trial in accordance with the views herein expressed. It is so ordered. All concur.