MARY BRADY, Respondent, v. ESTATE OF JOHANNA
BRADY, Deceased, and J. P. Wagner, Administrator of the
Estate of Johanna Brady, Appellants.

(194 N. W. 938.)

**Executors and administrators — evidence held insufficient to sustain action
for services of daughter in mother's lifetime.**

In an action by plaintiff against the administrator of the estate of her
deceased mother to recover for alleged services rendered in the mother's life-
time, it is *held,* that there is not sufficient evidence in the record to support
a verdict for the plaintiff and that the presumption of gratuitousness arising
from the relationship of the parties is not negatived by competent evidence
so as to entitle plaintiff to recover on an implied contract.

Opinion filed July 23, 1923. Rehearing denied September 11, 1923.

Executors and Administrators, 24 C. J. § 2184 p. 869 n. 19.

Appeal from the District Court of Burleigh County; *Nuessle,* J.
Reversed.

*Newton, Dullam & Young,* for appellant.

An express contract must be proved, or it must be shown that at the
time the service was rendered both parties intended and expected that
the service was to be paid for, and in such case stricter proof is re-
quired than in other cases, and no recovery can be had unless an ex-
press contract or circumstances equivalent thereto are shown. Humble
v. Humble, 152 Ky. 160.

"There is a presumption that the kindly services rendered by a foster
daughter to her foster father during his last illness are gratuitous, and
the law will not allow recovery for such services in the absence of an
express contract to pay for them, or the presence of such circumstances
as will be equivalent to such a promise. Parol evidence to prove such
a promise or circumstance from which such a promise can be implied
so as to bind the estate of a dead man, is weak evidence and should be

Note.—Implication of agreement to pay for services rendered by relative or
member of household, see note in 1 L.R.A.(N.S.) 819; 11 L.R.A.(N.S.) 873; 11
R. C. L. 209; 2 R. C. L. Supp. 1222; 4 R. C. L. Supp. 703; 5 R. C. L. Supp. 602.

corroborated to some extent at least." Daste v. Olson (La.) 29 L.R.A. (N.S.) 297.

"Particularly strong and convincing proof is required where the claim is stale, or where the services extended over a considerable period of time and no demand for compensation was ever made during the decedent's life time." 18 Cyc. 533.

"In the absence of circumstances showing extraordinary services to the deceased, the presumption of gratuity arising from the relation- ship of the parties negatives the liability upon implied contract." Krapp v. Krapp, 47 N. D. 308.

"Claims of this character against a decedent's estate should be carefully scanned by the court. They should be established only upon clear and satisfactory proof that the services were rendered under a mutual understanding or agreement of the parties that they would be paid for." Hoskins v. Sanders, 80 Conn. 19, 21.

"Stale claims are regarded with special disfavor and require very strong, and conclusive, testimony to establish them, particularly where the claim was never asserted during decedent's lifetime." 24 C. J. 406.

"Claims against a dead man's estate based on parol evidence must be rigidly scanned. If they might have been enforced against him while living, they are the subject of suspicion." Re Mathoit, 243 Pa. 375, 90 Atl. 140.

*Sullivan, Hanley* and *Sullivan,* for respondent.

This action on the part of the plaintiff is based upon the principle of law that the child is entitled to payment from a parent for services rendered if from the circumstances under which the services were rendered, a contract to pay for the services may be inferred. 29 Cyc. 1631 and cases cited under note 5; Krapp v. Krapp (N. D.) 181 N. W. 950; Bergerson v. Mattern (N. D.) 170 N. W. 877.

"In fact this element (nature of the services) ought not infrequently to be treated as being sufficient of itself to rebut the presumption which might otherwise be raised by the relationship of the parties, that the services were intended to be gratuitous."

"The nature of the services must be considered as an element bearing upon the enforceability of the claim." 11 L.R.A.(N.S.) ¶ VII. p. 890.

The nature of the services for which compensation is claimed is an element of great weight in determining the question of liability. Murrel v. Studstill, 30 S. E. 750; Frailey v. Thompson (Ky.) 49 S. W. 13.

JOHNSON, J.   This is an action to recover for services alleged to have been performed by the plaintiff for her mother, Johanna Brady, deceased, in and about the management of a rooming house, operated by the decedent at Bismarck, North Dakota, for several years prior to her death, which occurred on the 22d day of January, 1921.   The claim was presented to the administrator of the estate, who disallowed the same, and suit was brought thereon.   The administrator first appointed was J. D. McDonald, husband of one of the three daughters. of the decedent, Kate Brady McDonald, the other two daughters being the plaintiff, Mary, and a sister, Nellie Parker.   There are no other heirs.   Subsequently one J. P. Wagner succeeded McDonald as administrator.   At the time of the trial, Mr. McDonald was administrator of the estate.

In 1883, when plaintiff was about twenty-one years of age, the decedent and her three daughters came to Bismarck.   Three of them established, as a joint venture, a millinery and dressmaking business under the name of "Kate Brady & Company."   The firm continued in existence for about twelve years and, during that time, the property known as 307–4th Street, in Bismarck, was purchased and the house furnished with firm money, the title being placed in the name of the decedent.   The house at that time had seven rooms, but, having been partially destroyed by fire, was rebuilt in 1907 or 1908 as a house of fourteen rooms, designed for a rooming house.   The furniture originally purchased was in the house at the time of the trial.

During these early years, it appears that the plaintiff was in ill health and required considerable medical attention.   Bills for the services of professional men and for drugs necessary in her treatment were paid out of firm money, though she was never a member of the firm.   She was sent to a hospital in another state for treatment and the firm paid all expenses.   She "went east" for three years on account of ill health.   This was after the firm was dissolved, but the expenses were paid out of firm funds.   Plaintiff again went to a hospital for

treatment in 1919 or 1920. It appears that the cost of all the food and clothing necessary for all the members of the firm and for plaintiff was paid out of firm funds. After the firm went out of business, about 1895 or 1896, the plaintiff lived with her sister in Bismarck for some years and later with her brother at Helena, and again with a brother at Seattle until about 1908, when she returned to Bismarck. From 1908 until the death of her mother, she remained substantially all of the time with her mother in the rooming house.

The evidence shows that the rooming house was operated by the plaintiff and the decedent; that the work was done by both of them when their health permitted; and that the decedent was feeble and infirm and, in fact, bedridden during several months, several years, according to the testimony of plaintiff's witnesses, prior to her death. During the time of decedent's ill health, it appears that she needed a good deal of attention. She was unable to dress herself alone; she had to have personal help and subsequent to August, 1920, the calls of nature were responded to in her room by the use of a chair conveniently arranged for that purpose, and needed assistance and attention were given her nearly all the time by the plaintiff. While they were in good health, the plaintiff looked after the rooms upstairs and the mother, downstairs. There appears to have been a division of labor in running the boarding house until the mother became, through the infirmities of age and disease, unable to work actively, whereupon additional labor, in connection with the operation of the rooming house was imposed upon the plaintiff.

The evidence shows that money was deposited by the plaintiff in a bank in Bismarck, and that the plaintiff sometimes signed her mother's name to checks which were cashed. Roomers sometimes paid their room rent to plaintiff and sometimes to the decedent.

The proof failed to show an express contract and plaintiff elected to stand on an implied contract. The jury returned a verdict for the plaintiff upon which judgment was entered and, from this judgment, this appeal is prosecuted by the plaintiff.

Four assignments of error are set out in appellant's brief, the last of which we shall consider first, because in our view it is decisive of this appeal.

At the close of the trial defendant's counsel made a motion to dis-

miss upon the ground that the evidence failed to show a cause of action and that there was a failure of proof as to the existence of any contract, express or implied. The court denied the motion. The appellant further specifies as error "That the evidence is of that character that the verdict should be set aside as a matter of discretion," and "That the evidence is insufficient to support a verdict, as no facts have been proved which justify the conclusion that there was any contract between mother and daughter."

The motion made by the defendant, after both parties rested, is in the nature of a demurrer to the evidence and was, in fact, a motion for a directed verdict, altho the motion does not in terms so state. The question of the sufficiency of the evidence to support the verdict is, therefore, raised, and we must examine the record to determine whether or not there is substantial competent evidence in the record to support the verdict of the jury.

The plaintiff having elected to stand on an implied contract, the question that arises at the threshold of the case is whether or not, at the time the services were rendered, both parties intended and expected compensation therefor on the basis of their reasonable value. On this point, the testimony of the plaintiff's witness, John Runge, is most explicit and probably most favorable to plaintiff's theory. He testified that he roomed at the rooming house maintained by the decedent in Bismarck from September, 1909, until the time of the trial; that, during this time, and particularly from and after the year 1913, the plaintiff did most of the work; that she swept the rooms, made the beds, did the washing, cooked the food, took care of her mother and dressed her, combed her hair and generally ran the place. He says he had conversations with the mother at different times. Counsel for plaintiff asked the following questions: "Now then, with reference to this first conversation along in 1912, tell us what was said; tell us about what was said by her;" to which the witness answered: "We had quite often a conversation about it, about loaning money, etc., and said that—or I told her she better give up the rooming house, the work would become too hard for Mary to do and she says that was the only thing that they had to keep up the house expenses—to keep down the expenses, and that after she died *she figured* that Mary was going to keep the house." Again, the witness says that the decedent

said to him, in substance, that she would not sell the rooming house
because a son-in-law would borrow the money and decedent would then
have nothing left for Mary, the plaintiff. It appears that the witness
frequently suggested to the decedent that she give up the house, and on
one such occasion the witness says the decedent told him that after
she was dead she couldn't pay wages to plaintiff; that she would get
her wages in the property. Then this question and answer appear:
Q. *"What was it she said, if anything, about getting wages after she
was dead, about Mary getting wages after she was dead?"* A. "Well,
there was nothing said about it." Q. "What—a while ago you stated
about something Mrs. Brady had said as to what Mary would get after
Mrs. Brady died. Now, what was that?" A. *"She was going to leave
her the property."*

Mrs. Lauder testified for the plaintiff with reference to the work
done by Mary while witness roomed for a few months at the room-
ing house. On being asked if decedent and witness had conversations
with reference to how plaintiff would receive her compensation, the
witness said: "No, there was nothing said." This witness roomed in
the house from August, 1920, to February, 1921.

Mrs. Wermerskirchen, a witness for the plaintiff and a neighbor
of the decedent for about two years before her death, stated that
decedent said to her that she hoped that Mary would get paid; that
she would like to see that she was well paid for what she had done, as
Mary had worked there very hard and that she would like to see that
she was paid for her work and that she would like to see that she could
pay her. Again, this witness said that it was spoken of several times
"How she (decedent) would like to pay Mary for her work" and that
"she was sick."

The witness, John Danielson, testifying for the plaintiff, stated that
he had been a roomer in the decedent's rooming house and that he had
had several conversations with decedent; that in the course of these con-
versations the decedent said that the "home would be hers (Mary's)
when she died." "Tell us all that Mrs. Brady said in that connection
and what you said to her, leading up to her statement" (refer to above).
A. "Well, I was sitting down on the porch one evening and we got into
a conversation. We got to talking about her ill health and so I says:
"Well, Mrs. Brady, I suppose if something should happen to you some

of these days, what will become of Mary, she won't have a home?'
Well, she says 'she has got a home here,' she says as long — 'she has
got a home here as long as she lives. The home is hers.' That is the
remark she made to me."

The plaintiff herself testified that she came "back from the west to
take charge of the boarding house." Plaintiff did not testify to the
circumstances under which she lived on the west coast, or as to wheth-
er she had been engaged in remunerative employment which she aban-
doned in order to "take charge of the rooming house." She had been
with a brother, but whether visiting or working for wages, does not
appear. We are not unmindful of the statute, § 7871, Comp. Laws,
1913, which disqualifies the plaintiff as a witness to any transactions
with the decedent, and of the difficulties it puts in the plaintiff's
way. In passing it is sufficient to point out that the legislature, in
pursuance of what is doubtless believed to be a sound public policy,
has deemed it wise to seal the lips of one party to a transaction when
death has closed those of the other. The rule may work a hardship
at times, but that, on the whole, it embodies a salutary principle, most
experienced lawyers and judges will concede.

The foregoing is substantially all the testimony in the record that has
any bearing, whatever, upon the question of the existence of a mutual
understanding that the plaintiff should be paid for the services per-
formed in connection with the operation of the rooming house. We
have assumed that the testimony of plaintiff's witnesses is true, tho ·
to some extent disputed; the other evidence set out herein is undisputed
in the record. It will be observed that the statements are general;
mostly expressions of gratitude for and appreciation of the kindly
ministrations of plaintiff to the needs of the mother, and of a wish or
a desire that the plaintiff receive compensation in some form, and of
an understanding or hope that plaintiff would get the property after
the mother's death. Whether she intended to execute such wishes in
the form of a will, or expected that plaintiff should receive her com-
pensation in the form of her distributive share under the law of
succession, or anticipated that plaintiff would file a claim against the
estate, pursuant to a mutual understanding for compensation, the
record does not disclose.

The rule has been adopted in this state that services of the character

rendered in this case are presumed to be gratuitous. That is to say, the claimant does not establish a cause of action by proving that the services were, in fact, rendered, and their reasonable value, but must rebut the presumption of gratuitousness—which is one of fact—by competent evidence. It has, furthermore, been held by this court that a claimant against a decedent, notwithstanding a relationship like that in this case, may recover for services rendered as upon an implied contract. Krapp v. Krapp, 47 N. D. 308, 181 N. W. 950; Bergerson v. Mattern, 41 N. D. 404, 170 N. W. 877, 11 L.R.A.(N.S.) 874, note. The source of the obligation, whether the contract be express or implied, is the *intention* of the parties; the essential difference between an express and an implied contract is not of the substance, but lies in the form of the proof; the former is proved by direct, the latter by circumstantial, evidence. In the case at bar, therefore, the verdict for the plaintiff should not be disturbed if there is substantial evidence in the record from which the jury could find, under all the circumstances of the case, that it was the intention and understanding of the decedent and her daughter that she should be paid for her services; and it is not necessary that such understanding should be expressed in words, but it may be inferred from all the circumstances, the nature of the services, the conduct, and the relations of the parties.

Evidence, to be sufficient to overcome the presumption, must be reasonably clear and satisfactory. Donovan v. Driscoll, 116 Iowa, 339, 90 N. W. 60. Was there such evidence submitted to the jury? We do not think there is substantial evidence from which a jury could infer the existence of an expectation, on the part of both claimant and decedent, at the time the services were rendered, that they should be paid for; nor could the jury, from such evidence, by implication, find as a fact an understanding between the parties that the services be compensated. Re Teller, 200 Mich. 181, 166 N. W. 865; Butler v. Butler, 225 Mass. 22, 113 N. E. 577; Lovell v. Beedle, 138 Minn. 12, 163 N. W. 778; Re Klessig, 153 Minn. 27, 189 N. W. 424; Leighton v. Nash, 111 Me. 525, 90 Atl. 385; Rose v. Mays, 139 Mo. App. 246, 122 S. W. 769; Brown v. Holman, 292 Mo. 641, 238 S. W. 1065; McGarvy v. Roods, 73 Iowa, 365, 35 N. W. 488; Oliver v. Gardner, 192 Ky. 89, 232 S. W. 418. General expressions of gratitude are not sufficient to overcome the presumption of gratuitousness: Oliver

v. Gardner, supra; nor admissions or statements that the services were valuable. Donovan v. Driscoll, supra. While it is not necessary that the decedent should have known that her daughter expected payment for her services, the circumstances should be such that it can fairly be said that a reasonably prudent person would have known it. Spencer v. Spencer, 181 Mass. 473, 63 N. E. 947. The record does not disclose that there ever took place any conversations between the decedent and plaintiff with reference to compensation; it does not appear that the plaintiff was present at any of the conversations testified to by witnesses in the course of which the decedent expressed her gratitude for the faithfulness of plaintiff's work and a desire or wish that she should be adequately compensated therefor, at some time and in some form; Conway v. Conway, 130 Ky. 218, 113 S. W. 94; 24 C. J. 286; there is no evidence in the record to show that the plaintiff ever knew that her mother had expressed herself to the effect indicated in the testimony of the witnesses for the plaintiff, or that she continued to render services in reliance on such statements. Leighton v. Nash, 111 Me. 525, 90 Atl. 385; 24 C. J. 286.

The services rendered were not of such an extraordinary, peculiar, or menial character as to justify the jury in inferring or, by implication, finding an understanding between the parties that compensation should be made. The work seems to have been ordinary house work, aside from the personal care and attention which plaintiff gave her mother after the latter became enfeebled. We do not think that such attention was more than one member of a family accepts from or gives to another member, from ordinary affection, and without hope or expectation of financial remuneration. While the mother's health permitted, she did her share of the work and both had a home and a living from the business. The daughter did not leave remunerative employment to live with her mother; at least, there is no evidence she did.

Under all the circumstances, we do not believe it would be just to plaintiff, or in accordance with the ordinary and loving relations usually subsisting between mother and daughter, to hold that what actuated her to minister to the needs of her enfeebled mother was the hope of a wage rather than the impulse of filial affection.

The judgment of the trial court is reversed and the cause remanded for a new trial, the respondent to pay the costs of this appeal.

BRONSON, Ch. J., and BIRDZELL and CHRISTIANSON, JJ., concur.

Mr. Justice NUESSLE being disqualified Judge THOS. H. PUGH of the Sixth Judicial District sitting in his stead.

PUGH, District Judge (dissenting). I find myself unable to concur in the result reached in the foregoing opinion, and, therefore, respectfully dissent therefrom.

As I read the evidence in the case, the facts and circumstances proven are, in my opinion, of such a character that different impartial minds might fairly differ as to the inferences to be deduced therefrom. The verdict of the jury, therefore, is binding on the court and should not be disturbed in the absence of prejudicial error, in the record.