**In the Matter of the ESTATE of Meta THOMPSON, Deceased.**

**Herman GETZLAFF, Petitioner and Respondent,**

**v.**

**Elsie JOHNSON, Respondent and Appellant, and**
**Hubert Getzlaff et al., Respondents.**

**Civ. No. 8725.**

Supreme Court of North Dakota.

Nov. 12, 1971.

Ella Van Berkom, Minot, for respondent and appellant.

William A. Neumann, Bottineau, for petitioner and respondent.

ERICKSTAD, Judge.

Elsie Johnson, who is the daughter and one of the heirs of Meta Thompson, appeals to this court from the order of the district court of Bottineau County, dated November 13, 1970, which affirmed the

order of the Bottineau County Court disallowing Mrs. Johnson's claim in her mother's estate. Trial de novo is demanded.

The gist of the trial court's decision is that the evidence submitted does not establish the existence of an express or an implied contract to pay for the services which Mrs. Johnson performed for her mother during the last six years of her life.

Mrs. Johnson contends that she is entitled to recover from her mother's estate $30 per month or a total of $2160 for services rendered her mother during the last seventy-two months of her life. The trial court found, and we do not believe that it is seriously disputed on appeal, that Mrs. Johnson rendered substantial services to her infirm and aged mother over the last six years of her life. The court denied her claim, however, for the reason that it did not believe that she had sustained her burden of proving that the services were not gratuitous.

As the facts are not in dispute, we shall accept them as stated by Mrs. Johnson in her brief.

Meta Thompson died on January 25, 1969, at the age of 87 leaving four living children, to wit: three sons, Herman, Walter, and Hubert Getzlaff, and one daughter, Elsie Johnson, the appellant. Mr. Getzlaff, the father of the four children, died in 1932. An unmarried son, Henry Getzlaff, died in 1958, when Meta was 78. Meta inherited a quarter of land and $3354.14 from her son Henry at his death. At that time, although she had previously been receiving public welfare, she was taken off the welfare rolls and began living in a small house in Willow City, which was owned by her son Hubert.

In 1951 she married a Mr. Thompson, who died in the year 1954. Prior to her marriage to Mr. Thompson, she lived with her son Henry on his farm. Commencing in 1953, her daughter, Elsie, began to help her by hauling water, cleaning her home, and carrying coal.

After the death of her son Henry in 1958, she became more dependent upon Elsie.

Because it was thought that Mrs. Thompson could not care for herself during the winter, it became necessary to find a place for her to stay during the winter, and these arrangements fell upon Elsie to make. Elsie testified that she traveled 5886 miles over the last years of her mother's life looking for winter homes for her to live in. Each fall Elsie closed the home in Willow City and prepared it for the winter. In the spring she cleaned it preparatory to opening it again for her mother to live in during the summer. This necessitated at times painting, washing of dishes, preparation of bedroom, securement of food, water and fuel.

Elsie testified that she made three or four trips per day from her home in Willow City to her mother's home to be certain that she had the things she needed to be comfortable. Elsie did her mother's laundry, mending, and ironing at her own home, and when necessary she tended the coal furnace for her mother.

In 1965 Elsie arranged for a loan to be made to her mother to modernize the home in Willow City. She supervised the work and had it completed by March 1965. This project provided a half-bath on the same floor as her mother's bedroom and living quarters and relieved Elsie from the daily chore of emptying the "slop pail".

Until the last year of her mother's life, Elsie acted under a power of attorney, managing the land and her mother's money without receiving any remuneration for this service.

During 1968 Herman Getzlaff, one of Mrs. Thompson's sons, secured a power of attorney from his mother, and at about that time Elsie was relieved of the management of her mother's affairs.

On December 3, 1968, Mrs. Thompson executed a new will, which left to Elsie $15 and the residue to the other children.

By a previous will she was to have shared equally with her brothers. It is the December 3, 1968, will which is now being probated. Elsie contested the admission of that will to probate at the time of the hearing on the admission of the will to probate, but has not appealed from the order admitting the will to probate. Accordingly, any issue involving the propriety of admitting the will to probate is not before us at this time.

When Mrs. Thompson resided in the home of one of her sons for two and a half months, he was paid for her care. This son asserts that he and others did things for the mother for which they were not paid, but these things are not enumerated.

Elsie summarizes perennial duties performed for her mother as follows:

1. Washing and fixing her hair;

2. Taking care of her feet (toenails, corns, etc.);

3. Providing her annual birthday party, replete with cake, decorations, food, and guests;

4. Taking her to the doctor;

5. Soothing ruffled feelings of the landlady and her mother and when feelings could no longer be soothed, finding her another place to live;

6. Driving from home to home in an effort to find a place for her mother to live each fall and in between when required.

■ In support of her contention that she has overcome the presumption that services performed by a child for his parent are presumed to be gratuitous, Mrs. Johnson refers us to a quotation from Bergerson v. Mattern, 41 N.D. 404, 170 N.W. 877 (1918), which reads:

"Although the usual presumption is that services, rendered by a child to its parent, are gratuitous, in the absence of an express contract therefor, nevertheless, where the circumstances are exceptional and the character of the services rendered peculiar, a contract may be implied to pay for such services."

■ In Bergerson this court in 1918 found from the facts therein existing an implied contract, but note the great difference in the type of services rendered in Bergerson from the type of services rendered in the instant case.

A quotation from Bergerson relative to the facts reads:

"* * * The mother was paralyzed, practically helpless, did not respond to nature's calls, and needed the care and attention of an infant. She first came to live with her daughter in the year 1908; she remained there for some 2 years, and then went to South Dakota for some 9 months on a visit, thereafter returning to the home of the plaintiff in 1911, where she stayed until her death. On July 25, 1913, she became paralyzed, and for some two weeks until September 5, 1913, a nurse was secured for her. Thereafter, and until her death, she received the sole care and attention of her daughter."

In characterizing the type of service rendered, Judge Bronson, in Bergerson, speaking for the majority, said:

"The record amply discloses that the services performed were not only devoted and filial, but also burdensome, menial, and loathsome. The character of such services rendered showed high and efficient nursing."

Judge Robinson, specially concurring with the majority, said that the plaintiff "furnished her aged mother board, lodging, nursing and the best of care, lifted her from the bed to a chair, and from the chair to the bed, fed her like an infant, furnished her with clean diapers." In characterizing those services he said that, "The services rendered by the plaintiff were menial, tiresome, sickening, loath-

some, so that a regular nurse would have charged from $15 to $25 a day." Bergerson v. Mattern, *supra*, 170 N.W. 877, 878.

In pointing up the distinction between the facts in *Bergerson*, where the court found that the evidence had overcome the presumption of gratuity, from the facts in the instant case, the respondents refer us to Brady v. Brady's Estate, 50 N.D. 114, 194 N.W. 938, a decision rendered by this court in 1923.

In *Brady* the plaintiff daughter lived with her mother, the decedent, in a rooming house in the city of Bismarck from 1908 until the mother's death in 1921.

In that case the court said:

"The evidence shows that the rooming house was operated by the plaintiff and the decedent; that the work was done by both of them when their health permitted; and that the decedent was feeble and infirm and, in fact, bedridden during several months—several years, according to the testimony of plaintiff's witnesses—prior to her death. During the time of decedent's ill health it appears that she needed a good deal of attention. She was unable to dress herself alone; she had to have personal help, and subsequent to August, 1920, the calls of nature were responded to in her room by the use of a chair conveniently arranged for that purpose, and needed assistance and attention were given her nearly all the time by the plaintiff. While they were in good health the plaintiff looked after the rooms upstairs and the mother down stairs. There appears to have been a division of labor in running the boarding house until the mother became, through the infirmities of age and disease, unable to work actively, whereupon additional labor in connection with the operation of the rooming house was imposed upon the plaintiff." Brady v. Brady's Estate, *supra*, 194 N.W. 938, 939 (1923).

In *Brady* the jury returned a verdict for the plaintiff. Upon appeal this court said that the issue was whether at the time the services were rendered both parties intended and expected that the services would be compensated for on the basis of their reasonable value. After discussing the testimony of the various witnesses as to conversations they had had with the decedent concerning her intentions, the majority of the court, speaking through Justice Johnson, said:

" * * * The record does not disclose that there ever took place any conversations between the decedent and plaintiff with reference to compensation; it does not appear that the plaintiff was present at any of the conversations testified to by witnesses in the course of which the decedent expressed her gratitude for the faithfulness of plaintiff's work, and a desire or wish that she should be adequately compensated therefor at some time, and in some form (Conway v. Conway, 130 Ky. 218, 113 S.W. 94; 24 C.J. 286); there is no evidence in the record to show that the plaintiff ever knew that her mother had expressed herself to the effect indicated in the testimony of the witnesses for the plaintiff, or that she continued to render services in reliance on such statements (Leighton v. Nash [111 Me. 525, 90 A. 385], supra; 24 C.J. 286).

*"The services rendered were not of such an extraordinary, peculiar, or menial character as to justify the jury in inferring or by implication finding an understanding between the parties that compensation should be made.* * * * "* Brady v. Brady's Estate, *supra*, 194 N.W. 938, 941 (1923).

We have emphasized the last sentence of the above quotation for the reason that there is no evidence in the instant case from which an implied contract could be presumed other than the nature of the services themselves, as no testimony was submitted by any party relative to the expression of intent on the part of the recipient of the services.

In *Brady* the court laid down the law to be applied:

"The rule has been adopted in this state that services of the character ren-

dered in this case are presumed to be gratuitous; that is to say, the claimant does not establish a cause of action by proving that the services were, in fact, rendered, and their reasonable value, but must rebut the presumption of gratuitousness—which is one of fact—by competent evidence. It has, furthermore, been held by this court that a claimant against a decedent, notwithstanding a relationship like that in this case, may recover for services rendered as upon an implied contract. Krapp v. Krapp, 47 N.D. 308, 181 N.W. 950; Bergerson v. Mattern, 41 N.D. 404, 170 N.W. 877; 11 L.R.A.(N.S.) 874, note. The source of the obligation, whether the contract be express or implied, is the intention of the parties; the essential difference between an express and an implied contract is not of the substance, but lies in the form of the proof; the former is proved by direct, the latter by circumstantial, evidence. In the case at bar, therefore, the verdict for the plaintiff should not be disturbed if there is substantial evidence in the record from which the jury could find, under all the circumstances of the case, that it was the intention and understanding of the decedent and her daughter that she should be paid for her services; and it is not necessary that such understanding should be expressed in words, but it may be inferred from all the circumstances, the nature of the services, the conduct, and the relations of the parties.

"Evidence, to be sufficient to overcome the presumption, must be reasonably clear and satisfactory. * * *" Brady v. Brady's Estate, *supra*, 194 N. W. 938, 941.

It is contended by the respondent that the services performed by Mrs. Johnson in the instant case were much less burdensome, menial and loathsome than the services rendered by the plaintiff in Brady, and we agree.

It should also be noted that in Brady, the court was not trying the case anew on a demand for trial de novo, but was merely determining whether sufficient evidence existed to support the verdict of the jury. Notwithstanding the great care that was required and the extent and nature of the services rendered in Brady, the court found the evidence insufficient to establish an implied contract to pay for the services.

In Gange v. Gange, 79 N.D. 372, 56 N.W.2d 688 (1953), this court quoted with approval the law set forth in Brady.

Because these decisions are quite old and limited in number, one might inquire concerning the status of the law in other states of this country at the present time.

In response to such an inquiry, the respondent refers us to an annotation in 7 A.L.R.2d § 18, pages 50–52. This annotation published in 1949 discloses that the general rule that the services of a child are presumed to be gratuitous or that the mere rendition of services by a child is insufficient to raise a promise to pay therefor has been stated or implied in respect to services such as care and attention, nursing, housework, farmwork, board, managing property, and enemas.

In a recent decision of the Supreme Court of Arkansas that court affirmed the trial court in denying a daughter's claim against her mother's estate for personal services rendered her mother during the last few years of her mother's life. Apparently, in addition to running the mother's motel for some time, the daughter in that case cared for the mother in the motel as a bed patient during the last few weeks of her life. In denying the daughter's claim for personal services rendered the mother, the Arkansas court said:

"The law presumes that services rendered by a daughter to a mother are gratuitous, arising from natural love rather than hope of pecuniary reward. Hence the daughter has the burden of establishing at least an implied contract for payment. Williams v. Walden, 82 Ark. 136, 100 S.W. 898 (1907); Russell v. Baumann, 239 Ark. 830, 394 S.W.

2d 619 (1965). Services by a child to a parent may give rise to an implied contract if those services are of such extraordinary character 'that the parent would not expect a child, under the circumstances, to render such services without compensation.' Lineback v. Smith, 140 Ark. 500, 215 S.W. 662 (1919). Because of the circumstances we have enumerated, and the absence of substantial competent testimony, we are unable to say that Mrs. Hickman overcame the presumption." Craig v. Hickman, 247 Ark. 628, 447 S.W.2d 120, 123 (1969).

For reasons stated in this opinion, we concur with the trial court that the evidence submitted is insufficient to overcome the presumption that the services rendered by the daughter to the mother in the instant case were gratuitous. Accordingly, the order of the trial court is affirmed.

STRUTZ, C. J., and PAULSON, KNUDSON and TEIGEN, JJ., concur.